**2021 UT App 105**

## THE UTAH COURT OF APPEALS

GREG DANIELS AND SHARON K. DANIELS,
Appellees and Cross-appellants,
*v.*
DEUTSCHE BANK NATIONAL TRUST AND
OCWEN LOAN SERVICING LLC,
Appellants and Cross-appellees.

Opinion
No. 20190693-CA
Filed October 7, 2021

Third District Court, Silver Summit Department
The Honorable Kent R. Holmberg
No. 160500166

Steven W. Dougherty and Jason E. Greene, Attorneys
for Appellees and Cross-appellants

R. Spencer Macdonald and Benjamin J. Mann,
Attorneys for Appellants and Cross-appellees

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Deutsche Bank National Trust and Ocwen Loan Servicing LLC (individually, Deutsche and Ocwen; collectively, Bank) attempted to foreclose on a house owned by Greg and Sharon K. Daniels (Homeowners) years after Homeowners defaulted on their mortgage obligations. Homeowners brought suit, contending that the statute of limitations had run on Bank's right to foreclose on the trust deed securing Homeowners' loan. The district court agreed with Homeowners, ruling that Bank's right to foreclose had been extinguished, quieting title in favor of Homeowners, and awarding them attorney fees and costs. We

affirm and remand for the calculation of fees and costs Homeowners incurred on appeal.

BACKGROUND

¶2     In January 2007, Homeowners purchased a newly constructed house (the Property) in Kamas, Utah. Homeowners procured a loan of $333,000 (the Debt) from New Century Mortgage Corporation (New Century) to finance their purchase. The Debt was secured by a deed of trust (the Trust Deed) naming Mortgage Electronic Registration Systems Inc. as the beneficiary.

¶3     Greg Daniels, who was a real estate professional, experienced a reduction in income due to the housing market downturn, and by mid-2007, Homeowners had failed to make some of the monthly payments on the Debt. Although Homeowners had defaulted on the Debt, they continued to make some full and partial payments between April 2007 and November 2009. On September 25, 2008, the trustee recorded a "Notice of Default & Election to Sell" on the Property. As a result of the default notice, the Debt was accelerated and immediately due in full. Despite the acceleration, New Century did not schedule a trustee's sale and undertook no immediate further action to advance the foreclosure process.

¶4     Homeowners filed a bankruptcy petition on September 25, 2009, an action that stayed foreclosure proceedings. Saxon Mortgage Services Inc. (Saxon), which in 2009 had been assigned the servicing rights for the Debt, requested and was granted relief from the automatic stay on October 21, 2009. Saxon then assigned its right to service the Debt to Ocwen.

¶5     Homeowners' obligation to pay the Debt was discharged through bankruptcy in April 2010, resulting in Ocwen no longer being able to enforce the Debt personally against Homeowners. *See National Fin. Co. of Utah v. Valdez*, 359 P.2d 9, 10 (Utah 1961) ("[A] discharge in bankruptcy is neither a payment nor the

extinguishment of debts. It is simply a bar to their enforcement by legal proceedings.").

¶6      After receiving notice of the change of servicers, Homeowners wrote a letter to Ocwen on November 20, 2009, explaining their financial hardship and requesting a modification of the Debt. Along with the letter, Homeowners submitted a hardship affidavit and additional financial information on a form provided to them by Ocwen.

¶7      On February 16, 2010, Homeowners sought modification of their Debt obligations through the federal Home Affordable Modification Program (HAMP Plan). In documentation they submitted in connection with the HAMP Plan, Homeowners represented that they could not afford the mortgage payments and were in default. The submitted documentation clearly indicated that it concerned the mortgage and promissory note on the Property; it contained repeated references to mortgage payments, monthly loan payments, and delinquent amounts as they concerned the Debt. Ocwen agreed to modify Homeowners' Debt obligations upon Homeowners' compliance with several conditions. Under the proposed modification, Homeowners agreed to a trial period during which they would be required to make three monthly payments, which were about a thousand dollars less than their original monthly payments, by February 1, March 1, and April 1, 2010.

¶8      Homeowners made the first two payments on January 28 and February 25, but before they made the third, Ocwen notified Homeowners that the trial plan was canceled and that they would not be able to receive the HAMP Plan modification due to tax-lien issues with the "mortgage title that prevent[ed] acceptance into the program." After being so notified, Homeowners made no additional payments for the mortgage modification. Thus, their last payment was made on February 25, 2010.

¶9    Homeowners sent three additional letters (dated November 2010, April 2011, and October 2011) to Ocwen explaining their financial hardship and seeking a mortgage modification.

¶10    The November 2010 letter expressed that Homeowners "want[ed] to keep [their] home" and "work with Ocwen" to that end. Homeowners stated, "[W]e have been through bankruptcy . . . and have been discharged from our debts, including Ocwen." Homeowners noted that the discharge of their debts would "now make it easier to afford a modified mortgage." They requested of Ocwen, "Please review the information we have provided, and help us stay in our home. We would welcome an opportunity to mediate a new mortgage, and would be willing to have an appraisal done, to help us both arrive at a fair value." New signed copies of the hardship affidavit and an Ocwen financial form accompanied the letter.

¶11    The April 2011 letter recounted Homeowners' financial situation. Homeowners reiterated that while the Debt had been "discharged in bankruptcy," they hoped that "this attempt to modify [their] mortgage" would allow them to stay in their home. Homeowners also stated that this submission would be their "last attempt" "for a mortgage modification." Copies of paystubs, financial statements, and income tax returns accompanied the letter. An April 27, 2011 fax, only the cover of which is in the record, purported to contain Homeowners' recent paystubs and was apparently submitted in connection with the application for mortgage modification referenced in the April 2011 letter.

¶12    The October 2011 letter largely repeated what had been set out in the April 2011 letter. Once again, Homeowners noted that their mortgage obligation had been discharged in bankruptcy. They further expressed that they had "submitted multiple applications for a mortgage modification to Ocwen, with no success so far," but they nevertheless expressed hope

that "this attempt to modify" the mortgage would allow them "to stay in [their] home."

¶13    In January 2012, the beneficial interest in the Trust Deed was transferred to Deutsche. In June 2014, Homeowners appealed the denial of their mortgage modification. Ocwen responded and explained (1) the reasons for the denial, (2) that the Property had "a confirmed foreclosure sale date," and (3) that the "loan [was] not eligible for foreclosure suspension because [Ocwen had] not received a recent application." Homeowners also formally requested and received various documents so that they could conduct an audit of the loan. Homeowners spoke with an Ocwen representative in early July 2014 and said that Ocwen should "not be able" to foreclose because of the bankruptcy and that they would be open to a settlement for $80,000. On September 29, 2015, the trustee recorded a new notice of default. This time, however, the trustee recorded notice of a trustee's sale. The notice was published on April 5, 2016, and the sale was scheduled for May 6, 2016.

¶14    In April 2016, Homeowners filed a complaint, followed by an amended complaint a few days later, in which they sought a declaratory judgment that the six-year statute of limitations had run on Bank's right to foreclose against the Property. Homeowners also sought a decree quieting title to the Property in their favor.

¶15    After a period of discovery, Homeowners filed a motion for summary judgment (1) seeking a declaration that the statute of limitations had run preventing foreclosure, (2) quieting title in their favor, (3) directing Deutsche and Ocwen to reconvey the Trust Deed to Homeowners, and (4) awarding Homeowners attorney fees and costs. Bank filed its own motion for summary judgment requesting that the district court determine that the statute of limitations had not run and that it could foreclose on the Property.

¶16 On May 3, 2016, the parties stipulated that any "unexpired . . . statute of limitations or statute of repose applicable to claims relating to the enforcement" of the Trust Deed as identified in Homeowners' amended complaint was "tolled as of the date of filing" the complaint.

¶17 In May 2017, after full briefing and oral argument, the district court entered an order granting in part Homeowners' motion for summary judgment. The court concluded that the "statute of limitations applicable" to Bank's right to foreclose was "established by the version of Utah Code Ann. § 57-1-34 that was in effect at the time this action was commenced." That statute read as follows:

> The trustee's sale of property under a trust deed shall be made, or an action to foreclose a trust deed as provided by law for the foreclosure of mortgages on real property shall be commenced, within the period prescribed by law for the commencement of an action on the obligation secured by the trust deed.

Utah Code Ann. § 57-1-34 (LexisNexis 2010).[1] Thus, the court concluded that to timely foreclose on the Property, Bank needed to take the necessary foreclosure action—either completion of a nonjudicial foreclosure sale or initiation of a judicial foreclosure action—within the time period provided

---

1. The current version of the statute, effective May 10, 2016, requires only that, for nonjudicial foreclosures, the filing of a notice of default—rather than completion of a trustee's sale—happen within the limitations period: "A person shall, within the period prescribed by law for the commencement of an action on an obligation secured by a trust deed: (1) commence an action to foreclose the trust deed; or (2) file for record a notice of default under Section 57-1-24." Utah Code Ann. § 57-1-34 (LexisNexis Supp. 2020).

by the statute of limitations applicable to enforcement of the Debt. And there was no doubt—based on either one of two statutes, *see id.* § 78B-2-309 (2012); *id.* § 70A-3-118 (2009)—that the applicable limitations period for a foreclosure action was six years.[2]

¶18 But while the parties agreed that the applicable limitations period was six years, they disagreed about when that six-year limitations period started to run. Relevant to this question is section 78B-2-113(1) of the Utah Code, which states as follows:

---

2. The change in Utah Code section 78B-2-309 lends itself to confusion in the context of this opinion. At the time relevant to the events at issue, subsection (2) of the statute read as follows: "An action may be brought within six years . . . upon any contract, obligation, or liability founded upon an instrument in writing . . . ." Utah Code Ann. § 78B-2-309(2) (LexisNexis 2012). But as of May 2019, the language of subsection (2) was entirely replaced with the following language:

> For a credit agreement, as defined in Section 25-5-4, the six-year period described in Subsection (1) begins the later of the day on which: (a) the debt arose; (b) the debtor makes a written acknowledgment of the debt or a promise to pay the debt; or (c) the debtor or a third party makes a payment on the debt.

*Id.* (Supp. 2021). To be clear, the current iteration of subsection (2) is not relevant to this opinion except insofar as it is apt to cause confusion, not in small part owing to its striking similarity to Utah Code section 78B-2-113(1), which does play a central part in this opinion. *See id.* § 78B-2-113(1) (LexisNexis 2018). The relevant version of subsection (2) remains codified at Utah Code section 78B-2-309(1)(b). *See id.* § 78B-2-309(1)(b) (LexisNexis Supp. 2021).

> An action for recovery of a debt may be brought within the applicable statute of limitations from the date: (a) the debt arose; (b) a written acknowledgment of the debt or a promise to pay is made by the debtor; or (c) a payment is made on the debt by the debtor.

*See id.* § 78B-2-113(1) (2018). Relying on this statute, read in conjunction with section 78B-2-309, *see id.* § 78B-2-309(2) (2012) ("An action may be brought within six years . . . upon any contract, obligation, or liability founded upon an instrument in writing . . . ."), Homeowners argued that the six-year period began running on the date they made their last payment on the Debt, namely, February 25, 2010. Thus, Homeowners asserted, "Since a trustee's sale of the Property did not occur within six years of [Homeowners'] last payment, [Bank was] barred from taking any further action to enforce the Trust Deed."

¶19 Bank took a different view and made four arguments in response. First, relying on Utah Code section 70A-3-118(1), *see id.* § 70A-3-118(1) (2009) ("[A]n action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note or, if a due date is accelerated, within six years after the accelerated due date."), it argued that each monthly installment Homeowners made on the Debt constituted a separate obligation with its own six-year statute of limitations. Second, it argued that the statute of limitations would not begin to run until the maturity of the note for the Debt, which it identified as February 1, 2037. Third, it argued that the six-year limitations period restarted with each notice of default. Fourth, it pointed to section 78B-2-113 and argued in the alternative that Homeowners had made "a written acknowledgement of the debt and/or promise to pay the debt," resulting in "the statute of limitation [beginning] to run anew." "Thus," Bank argued, "even under Homeowners' interpretation of applicable law, [Bank had] six years from the date of [the October 2011 letter] to foreclose."

¶20    After considering the parties' arguments, the court concluded that the applicable limitations period began to run "from the latest event described" in section 78B-2-113(1), namely, the date on which (1) the Debt arose, (2) Homeowners made written acknowledgment of or promise to pay the Debt, or (3) Homeowners made a payment on the Debt. The court rejected Bank's argument that Homeowners' communications with Ocwen regarding loan modification constituted written acknowledgment that would renew the limitations period of the Debt. Addressing the October 2011 letter, *see supra* ¶ 12, the court observed that the letter did not "specifically acknowledge the [D]ebt" but instead stated "that the [D]ebt at issue had been discharged in bankruptcy." The court went on to conclude that (1) Homeowners' "purpose in sending the letter was to seek a modification of their mortgage in order to stay in their home," (2) "[s]eeking to modify a mortgage is not equivalent to acknowledging a debt or promising to pay a debt," and (3) seeking to modify a mortgage to prevent foreclosure "does not renew the statute of limitation commencement date under" section 78B-2-113.

¶21    Thus, the court determined "that the six-year statute of limitations . . . began to run on the date of [Homeowners'] final payment towards the [D]ebt, which was February 25, 2010." The court therefore concluded that "pursuant to Utah Code Ann. § 57-1-34, the statute of limitations [expired] on February 25, 2016," and with its passing, Bank's "right to enforce the Trust Deed through a trustee's sale or judicial foreclosure action" had also expired.

¶22    The court also rejected an equitable estoppel argument advanced by Bank. "[T]o support an equitable estoppel defense," the court explained that Bank

> must prove three things: (1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (2) reasonable action or inaction by the other party,

> taken on the basis of the first party's statement, admission, act, or failure to act; and (3) injury to the second party that would result from allowing the first party to contradict or repudiate the statement, admission, act, or failure to act.

(Citing *Baldassin v. Freeman*, 2009 UT App 109U, para. 9.) The court concluded that Bank had "failed to demonstrate any inconsistency between the actions taken by [Homeowners] during the limitations period and the position they [were] taking in [the lawsuit]." In the court's estimation, Homeowners'

> efforts to modify their mortgage in order to stay in their house was straight-forward and obvious. [They] did nothing to prevent [Bank] from rejecting [their] modification application and initiating a trustee's sale or foreclosure action during the limitations [period]. There is no inconsistency between seeking a modification of a mortgage during the limitations period and asserting a statute of limitations defense after the limitations period has run. [Bank was] not lulled into inaction by [Homeowners'] pursuit of a mortgage modification.

Therefore, the court ruled that "equitable estoppel [did] not weigh in here to prevent [Homeowners] from asserting a statute of limitations bar on [Bank's] right to" foreclose on the Property.

¶23 Even though the court determined that the statute of limitations had run on Bank's pursuit of foreclosure, it initially rejected Homeowners' request for quieting title to the Property or, alternatively, requiring Bank to reconvey the Trust Deed. However, after Homeowners filed a motion to reconsider, the district court entered an order quieting title to the Property in Homeowners' favor. It reasoned that Bank no longer had an interest in the Property because its beneficial interest—as

evidenced by the Trust Deed—could no longer be enforced. Accordingly, the court concluded that Homeowners' "claim to title in the Property [was] superior to the Trustee's claim, because the Trustee no longer [had] any power to enforce the Trust Deed." Thus, because the Trust Deed was "ineffective but remain[ed] a cloud on the title" and because Homeowners' "claim and interest in the Property [was] superior" to Bank's interest, the court quieted title in Homeowners' favor.

¶24    After final judgment was entered (1) declaring that the statute of limitations had run on Bank's ability to foreclose on the Property and (2) quieting title in favor of Homeowners, Homeowners filed a motion for attorney fees. Following briefing and oral arguments, the court granted the motion and awarded fees and costs in the amount of $95,523.04 to Homeowners. Bank appeals.

## ISSUES AND STANDARDS OF REVIEW

¶25    Bank first contends that the district court erred in determining that the statute of limitations had expired on its right to foreclose on the Property. We review "[t]he application of a statute of limitations . . . for correctness. But application of a statute of limitations may also involve subsidiary factual determinations, which we review in the light most favorable to the non-moving party." *Moshier v. Fisher*, 2019 UT 46, ¶ 6, 449 P.3d 145 (quotation simplified).

¶26    Bank next asserts that the court erred in quieting title to the Property in Homeowners' favor. "Determination of the proper scope of a quiet title action presents a legal question that we review for correctness." *Thatcher v. Lang*, 2020 UT App 38, ¶ 21, 462 P.3d 397 (quotation simplified).

¶27    Lastly, Bank claims that the court erred in awarding Homeowners their attorney fees. "Whether attorney fees are recoverable in an action is a question of law, which we review

for correctness." *Valcarce v. Fitzgerald*, 961 P.2d 305, 315 (Utah 1998).[3]


ANALYSIS

I. Statute of Limitations on Foreclosure

A.  The statute of limitations started running with the last payment.

¶28  Under Utah law, the statute of limitations on the right to foreclose on property pursuant to a deed of trust is tied to the statute of limitations on the right to enforce the underlying debt secured by the deed of trust. *See* Utah Code Ann. § 57-1-34 (LexisNexis 2010) (stating that foreclosure must be undertaken "within the period prescribed by law for the commencement of an action on the obligation secured by the trust deed"). The statute of limitations for enforcement of an obligation secured by a trust deed is six years. *See id.* § 70A-3-118 (2009); *see also Deleeuw v. Nationstar Mortgage LLC*, 2018 UT App 59, ¶¶ 12–13, 424 P.3d 1075 (clarifying that the statute of limitations identified in Utah Code section 70A-3-118(1) applies to foreclosure on a trust deed). Because the statute of limitations for enforcement of the underlying debt is six years, and because Utah law ties the foreclosure limitations period to the debt-enforcement limitations period, the applicable statute of limitations for foreclosure actions is six years.

---

3. Homeowners also filed a motion asking us to strike Bank's reply brief on the grounds that it contains new arguments, inaccurate and unsupported factual assertions, and an irrelevant and immaterial argument. We deny this motion but note that we have not relied on the challenged material contained in Bank's reply brief except insofar as to summarily reject Bank's exceptional-circumstances argument. *See infra* note 4.

¶29 The determinative questions in this case are when that six-year period began to run, whether it was ever tolled or restarted, and ultimately whether Bank's right of foreclosure on the Property is now time-barred. Prior to May 2016, Utah law required that one of two actions be taken prior to expiration of the six-year period: (1) completion of a "trustee's sale of property under a trust deed" or (2) the filing of "an action to foreclose a trust deed." *See* Utah Code Ann. § 57-1-34 (LexisNexis 2010); *id.* amend. notes (Supp. 2020). Bank never completed a trustee's sale on the Property, and it did not commence any action for judicial foreclosure. Thus, the resolution of this appeal hinges on whether the limitations period on the Debt secured by the Trust Deed ran before Bank completed a nonjudicial foreclosure sale or initiated a judicial foreclosure on the Property. The district court ruled that the limitations period began running on the date of Homeowners' last payment and expired six years later on February 25, 2016, prior to the completion of a trustee's sale. Bank does not contest the district court's conclusion that the six-year limitations period began to run on February 25, 2010, when Homeowners made their last payment. But Bank presents several arguments to support its assertion that the statute of limitations did not expire six years from that date but instead was extended or tolled. We address these arguments in the following sections.

B.     Homeowners did not acknowledge the Debt after the last payment.

¶30 A key issue on appeal, as noted by Bank during oral argument, is whether the district court erred in determining that various communications from Homeowners to Ocwen asking to be considered for loan modification constituted written acknowledgment of the Debt, even though it had been discharged in bankruptcy.

¶31 Bank argues that Homeowners repeatedly acknowledged the Debt when they sought mortgage relief from Ocwen. Specifically, Bank asserts that Homeowners' post-bankruptcy

communications concerning mortgage modification, *see supra* ¶¶ 9–12, constituted written acknowledgment that they owed and would pay the Debt. These communications, Bank argues, "re-started the limitations period each time [Homeowners] sent them." Thus, by Bank's reasoning, the six-year limitations period repeatedly re-started with Homeowners' various communications seeking mortgage modification because these communications constituted written acknowledgment of the Debt. We disagree.

¶32    To restart a statute of limitations, an acknowledgement of a debt must be "clear, distinct, direct, unqualified, and intentional." *See Wells Fargo Bank, NA v. Temple View Invs.*, 2003 UT App 441, ¶ 9, 82 P.3d 655; *see also Salt Lake Transfer Co. v. Shurtliff*, 30 P.2d 733, 736 (Utah 1934) ("[N]othing short of a distinct, direct, unqualified, and intentional admission of a present, subsisting debt on which a party is liable will be sufficient to take the obligation out of the statute and start it running anew."). Moreover, an acknowledgment "must be more than a hint, a reference, or a discussion of an old debt; it must amount to a clear recognition of the claim and liability as presently existing." *See Beck v. Dutchman Coal. Mines Co.*, 269 P.2d 867, 870 (Utah 1954) (quotation simplified); *accord Wells Fargo*, 2003 UT App 441, ¶ 9.

¶33 Contrary to Bank's assertion, Homeowners never acknowledged that they were still obligated to repay the Debt in any of their communications in a "clear, distinct, direct, unqualified, and intentional" manner. *See Wells Fargo*, 2003 UT App 441, ¶ 9. Neither did Homeowners acknowledge that they were "liable" for the Debt as "present" and "subsisting." *See Salt Lake Transfer Co.*, 30 P.2d at 736. To the contrary, while Homeowners certainly recognized that they had previously been on the hook to repay their mortgage loan, in each communication made to Ocwen after the bankruptcy proceedings, they explicitly stated that the Debt had been discharged in bankruptcy and that they were no longer personally liable to repay it.

¶34 Bank counters by seeking to draw an equivalency between Homeowners' recognition of its continuing right to foreclose on the Property and an acknowledgment of personal liability on the Debt. But acknowledgement of a debt requires more than recognizing a right to foreclose. "Debt has been defined variously, but generally it is an obligation to pay a fixed and certain sum of money. A debt is usually a monetary sum that is owed to another." *Olsen v. Fair Co.*, 2016 UT App 46, ¶ 10, 369 P.3d 473 (quotation simplified). Thus, for Homeowners' communications to constitute an acknowledgement of the Debt after discharge by the bankruptcy court, Homeowners would have had to acknowledge that they continued to personally owe something to Bank. But Homeowners' personal liability for the Debt had been discharged by the bankruptcy court, and with that discharge, any amount owed ceased to exist relative to Homeowners personally. *See Fitzgerald v. Critchfield*, 744 P.2d 301, 305 (Utah Ct. App. 1987) (stating that discharge of a debt in bankruptcy divests a debt "of its character as a legally enforceable personal liability"). Acknowledgment of a right to foreclose on the Property is not the same thing as acknowledgment of personal liability on the Debt, especially where, as here, Homeowners' personal liability on the Debt had been discharged in bankruptcy.

¶35 In their written communications with Ocwen, Homeowners did not acknowledge the Debt or obligate themselves to repay it despite their discharge; instead, Homeowners were asking Ocwen not to exercise the right to foreclose against the Trust Deed securing the Debt. In exchange for not foreclosing, Homeowners proposed to enter into a new deal that would allow Ocwen to recoup its losses while allowing Homeowners to stay in their home. Homeowners certainly never offered to repay the Debt that had been discharged, and they never hinted that they might have some continuing or current obligation to do so.

¶36 In sum, we agree with the district court's determination that Homeowners' communications with Ocwen did not

function as an acknowledgment of the Debt because, at most, those communications were a "reference" to "or a discussion of an old debt," not "a clear recognition of [a] claim and [a] liability as presently existing." *See Beck*, 269 P.2d at 870 (quotation simplified).

C.     The running of the limitations period was not tolled by the bankruptcy stay or the statutory hold on the trustee's sale.

¶37     Bank also argues that the statute of limitations was tolled by two discrete events. It is unclear that these tolling issues were preserved below. But assuming they were, we agree with Homeowners that Bank's arguments in this regard are unpersuasive. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation.").

¶38     Tolling is essential to Bank's argument on appeal because, owing to the stipulation, *see supra* ¶ 16, if the limitations period was tolled for a sufficient amount of time, Bank's right to foreclose would be evaluated under the current version of Utah Code section 57-1-34, which became effective May 10, 2016, rather than the version of the statute in effect prior to that date. Prior to May 10, 2016, "[t]he trustee's sale of property under a trust deed [had to] be made, or an action to foreclose a trust deed as provided by law for the foreclosure of mortgages on real property [had to] be commenced, within the period prescribed by law for the commencement of an action on the obligation secured by the trust deed." Utah Code Ann. § 57-1-34 (LexisNexis 2010); *id.* amend. notes (Supp. 2020). But as of May 10, 2016, the statute prescribed, "A person shall, within the period prescribed by law for the commencement of an action on an obligation secured by a trust deed: (1) commence an action to foreclose the trust deed; or (2) file for record a notice of default under Section 57-1-24." *Id.* (Supp. 2020). Thus, the key difference between the two statutes, as concerns nonjudicial foreclosure

efforts, was that prior to May 16, 2016, the *trustee's sale* had to be completed during the limitations period, but the current statute requires only that *a notice of default be recorded* prior to the running of the limitations period. Because a notice of default was recorded before the limitations period had run, Bank clearly would have the right to enforce its lien under the post-May 10, 2016 statute. But if the earlier statute controls, the limitations period expired before Bank completed the necessary actions.

¶39   Bank first argues that the automatic stay associated with Homeowners' bankruptcy petition tolled the limitations period for forty days. But the bankruptcy petition and automatic stay, which occurred in September and October 2009, obviously preceded the triggering of the running of the limitations period, which the parties acknowledge began or was re-started on February 25, 2010, the date of Homeowners' last payment on the Debt. Bank addresses this obstacle by arguing that because the limitations period actually began with the filing of the first notice of default and consequent acceleration of the due date on September 25, 2008, the bankruptcy stay occurred after the limitations period began. *See id.* § 70A-3-118(1) (2009) ("[A]n action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note or, if a due date is accelerated, within six years after the accelerated due date."). Bank then asserts that Homeowners "*re-started* the statute of limitations per Utah Code Ann. § 78B-2-113 by making a payment on February 25, 2010 . . . , thus leading to a tolling of the limitations period to February 25, 2016." (Quotation simplified.) In essence, Bank argues that tolling associated with the bankruptcy stay from 2009 should be applied to the subsequent limitations period triggered or re-started when Homeowners made their last payment on February 25, 2010. We find this argument unconvincing. Bank cites no precedent, nor are we aware of any, that allows the "banking" of the time tolled by a past action such that it can be applied to a limitations period yet to be commenced by a new triggering event.

¶40    Bank also points to the three-month statutory hold required before a trustee is allowed to conduct a trustee's sale after recording the notice of default in nonjudicial foreclosure actions. *See id.* § 57-1-24(2) (2010) ("The power of sale conferred upon the trustee . . . may not be exercised until . . . not less than three months has elapsed from the time the trustee filed for record [the notice of default]."). Bank contends that the language in Utah Code section 78B-2-112 "tolls or extends any limitations period to include such statutory prohibitions" as the three-month hold identified in section 57-1-24(2). *See id.* § 78B-2-112 (2018) ("The duration of an injunction or statutory prohibition which delays the filing of an action may not be counted as part of the statute of limitations."). We find this argument unavailing because it misreads the plain language of the two statutes. Section 78B-2-112 provides for tolling when a "statutory prohibition . . . delays the filing of an action." *See id.* But section 57-1-24(2) does not pertain to the filing of an action; rather, in nonjudicial foreclosure proceedings, the statute prohibits a trustee from exercising the power of sale until at least three months have passed after recording a notice of default. *See Napue v. Gor-Mey West, Inc.*, 175 Cal. App. 3d 608, 616 (Ct. App. 1985) ("Statutes of limitation, which fix the time within which a suit must be commenced, are to be distinguished from other procedural statutes fixing times to do acts or seek judicial relief. The three-month [hold on conducting a trustee's sale] does not fix the time within which a suit must be commenced, but rather fixes the time for curing a default in payments on a note secured by a deed of trust. The three-month [hold] is, therefore, not a statute of limitation." (quotation simplified)).

¶41    In other words, the prohibition in section 57-1-24(2) is not an injunction or a prohibition on the filing of an action but rather suspends the time for a trustee to exercise the power of sale to provide a period for the debtor to cure its default. Thus, reading section 57-1-24(2) in light of section 78B-2-112 does nothing to convert section 57-1-24(2) into a statute of limitations because section 57-1-24(2) does not concern the filing of any action; rather, it is a statutory hold on the trustee's power of sale. In

short, because statutes of limitations fix the time within which a suit must be filed, and because there is no action to be filed in nonjudicial foreclosure proceedings, section 78B-2-112 does not apply. *See* Bryan A. Garner, *Garner's Dictionary of Legal Usage* 862 (3d ed. 2011) ("*Action* denotes a mode of proceeding in court . . . to enforce a private right or redress or prevent a private wrong. . . . Today, since virtually all jurisdictions have merged the administration of law and equity, the terms *action* and *suit* are interchangeable." (quotation simplified)); *id.* at 361 (explaining that "file is often used as an ellipses for *file suit*"); *see also Napue*, 175 Cal. App. 3d at 616 ("The statute of limitation provisions of the Code of Civil Procedure are applicable to civil actions and special proceedings of a civil nature both of which are *judicial* remedies. A trustee's sale pursuant to a power of sale under a deed of trust is not a judicial remedy. Such trustee's sale is alternately referred to as an extrajudicial or nonjudicial foreclosure. The statute of limitation provisions are, therefore, clearly inapplicable to a trustee's sale." (quotation simplified)). Accordingly, we reject Bank's argument that the three-month hold on conducting the trustee's sale acted to toll the limitations period.

D.    Equitable estoppel did not toll the statute of limitations.

¶42    Bank next claims that the district court "erred in not tolling the statute of limitations via the 'equitable estoppel' doctrine."[4] To prevail on its claim of equitable estoppel, Bank must prove each of three elements:

---

4. Alongside its equitable estoppel argument, Bank argues that the federal prohibition on dual tracking tolled the statute of limitations. Bank identifies no place in the record where this issue was presented to the district court. And when a party fails "to preserve an issue in the trial court, but seeks to raise it on appeal . . . , this court will not typically reach the issue absent some recognized exception." *State v. Johnson*, 2017 UT 76, ¶ 17,

(continued…)

> (1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (2) reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act or failure to act; and (3) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.

*Benge v. Cody Ekker Constr.*, 2019 UT App 164, ¶ 20, 451 P.3d 667 (quotation simplified); *accord In re Koller*, 2018 UT App 27, ¶ 23, 424 P.3d 926.

¶43 We agree with the district court that there is no evidence that Homeowners' actions were inconsistent with their claim that foreclosure was barred by the running of the statute of limitations. Seeking to avoid a foreclosure during the limitations period and then later asserting a statute of limitations defense after the limitations period had run is in no way inconsistent. Instead, Homeowners' actions were logically sequential. Having repeatedly failed to convince Ocwen to agree to a mortgage modification during the six-year limitations period,

---

(…continued)

416 P.3d 443. Bank nevertheless asserts that we should consider this issue under the exceptional-circumstances doctrine. But Bank has made no effort to explain how the exceptional-circumstances doctrine applies here—except for the bald assertion that it does. More specifically, it has failed to explain what "rare procedural anomaly" prevented it from preserving the issue or excused its failure to do so. *See id.* ¶ 29. And as our supreme court has stated, "the showing of a rare procedural anomaly has been requisite to invoking exceptional circumstances." *See id.* ¶ 31. Thus, we decline Bank's invitation to consider its dual-tracking-tolling argument.

Homeowners then asserted the obvious defense to foreclosure once the limitations period had expired. Bank claims that Homeowners' requesting forbearance of foreclosure efforts is "inconsistent" with their "later claim" that Bank "should then be punished and permanently prevented from foreclosing on the . . . Property." But this assertion mischaracterizes the record, which shows that (1) Ocwen cancelled the HAMP Plan in early 2010 and never offered the mortgage modification contemplated by that plan, *see supra* ¶ 8, (2) Homeowners made repeated efforts asking Ocwen to reconsider, *see supra* ¶¶ 9–12, and (3) Homeowners asserted a statute of limitations defense after receiving notice of the trustee's sale, *see supra* ¶¶ 13–14. Rather than displaying inconsistency, Homeowners pursued the appropriate remedy available at the relevant time. In other words, Homeowners acted exactly as one would expect them to act relative to the circumstances in which they found themselves.

¶44 Moreover, Bank has not demonstrated that it acted reasonably in failing to foreclose the Trust Deed within the limitations period. Put another way, Homeowners' repeated attempts to enter into mortgage modification in no way induced Bank not to pursue foreclosure after Homeowners abandoned their modification requests. Our supreme court recently clarified that the second prong of the equitable estoppel test "requires reasonable action or inaction by the other party taken on the basis of the first party's statement, admission, act, or failure to act—that is, a plaintiff must show not only that [it] was induced into action or inaction by the defendant's statement, admission, act, or failure to act, but also that . . . [its] action or inaction was reasonable." *Fitzgerald v. Spearhead Invs., LLC*, 2021 UT 34, ¶ 28, 493 P.3d 644 (quotation simplified). According to the record, Homeowners' final request for mortgage modification was submitted in October 2011, and the last communication Homeowners had with Ocwen about the foreclosure was in July 2014. Ocwen is an experienced mortgage loan company. One would expect that, as a sophisticated party, Ocwen would have reasonably concluded that Homeowners had abandoned their efforts to work out a modification after months of not hearing

from them. But even after it was apparent that a mortgage modification was not likely, Ocwen did not act to foreclose on the Property until after the limitations period had expired in February 2016. We fail to see how Ocwen's inaction can be considered reasonable in these circumstances.

¶45 For the above reasons, Bank's equitable estoppel argument is unavailing.

E. The running of the statute of limitations extinguished Bank's right to foreclose.

¶46 Bank next argues that the district court erred in determining that foreclosure was no longer an available remedy after the limitations period expired.

¶47 We agree with the district court that the Trust Deed was no longer enforceable as security on the Debt after the limitations period had run. After Homeowners' personal liability for the Debt was discharged in bankruptcy, Bank no longer had the right to collect from Homeowners; rather, what remained after discharge was Bank's right to foreclose against the Property. But based on the applicable statute at the time, the trustee's sale had to have been completed by the time the limitations period for enforcing the underlying obligation expired, which was six years from the date of Homeowners' last payment. *See* Utah Code Ann. § 57-1-34 (LexisNexis 2010); *id.* § 78B-2-113(1)(c) (2018); *id.* § 70A-3-118 (2009).

¶48 Bank cites *Kamas Securities Co. v. Taylor*, 226 P.2d 111 (Utah 1950), for the assertion that "a pledge is not terminated by the running of the statute of limitations against the claim secured by the pledge, nor by the discharge of the claim in bankruptcy." *Id.* at 117 (quotation simplified). But "[t]his common law regime has been altered by statute in Utah." *Cf. M.J. v. Wisan*, 2016 UT 13, ¶ 47, 371 P.3d 21. *Kamas* was decided well over a decade before section 57-1-34 was enacted by the Utah Legislature, *see* Act of Mar. 7, 1961, ch. 181, § 16, 1961 Utah Laws 529, 537. And

"where a conflict arises between the common law and a statute . . . , the common law must yield because the common law cannot be an authority in opposition to our positive enactments." *Gottling v. P.R. Inc.*, 2002 UT 95, ¶ 7, 61 P.3d 989 (quotation simplified). Thus, Utah Code section 57-1-34, owing to more recent enactment, supplants the common law principle contained in *Kamas* for the right to foreclose on a trust deed after the statute of limitations on the underlying debt has expired.

¶49    Bank also cites *DiMeo v. Nupetco Associates, LLC*, 2013 UT App 188, 309 P.3d 251, for the proposition that "foreclosure is still an available remedy, even after the debt is discharged in bankruptcy, and even after the statute of limitations has run." But *DiMeo* is easily distinguished from the case at hand. As an initial matter, in *DiMeo* this court did not analyze the impact of section 57-1-34, which, as noted, altered the common law regime and created a separate statute of limitations for foreclosure actions. But in addition, *DiMeo* is distinguishable on its facts. In *DiMeo*, Vern and Eleanor Strand, along with at least one other member of their family, were obligors on a promissory note, which was secured by a trust deed granting a security interest in Vern and Eleanor's property. *Id.* ¶ 2. Vern and Eleanor died, but another family member obligor—Michael—continued to make periodic payments on the note. *Id.* ¶ 3. The district court "ruled that the trust deed was unenforceable . . . due to the running of the statute of limitations, [when the note holder's] ability to collect from [Vern and Eleanor] personally had expired." *Id.* ¶ 4. This court faulted the district court for not explaining "how the mere fact that some obligors on the note can no longer be held personally liable undercuts the continued vitality of the trust deed as security for the note." *Id.* ¶ 9. Importantly, in *DiMeo*, the trust deed still validly secured Michael's obligation due under the note because the statute of limitations had not run as to him. *See id.* ¶ 10.

¶50    In contrast, the limitations period at issue here—which was triggered in February 2010 when Homeowners made their final payment—ran in February 2016 and extinguished Bank's

ability to foreclose. In other words, the running of the statute of limitations prevented Bank from enforcing the trust deed. But in this case, unlike in *DiMeo,* there is no co-obligor remaining. There is no Michael Strand here. Homeowners are the only obligors on the Debt, and neither they nor anyone else made another payment after February 2010. Thus, *DiMeo* is of little help to Bank. Indeed, in another case from this court discussing *DiMeo*, the impact of Michael's periodic payments is identified as the key factor in upholding the right to foreclose. *See Roger P. Christensen IRA v. American Heritage Title Agency, Inc.*, 2016 UT App 36, ¶ 24, 368 P.3d 125 ("The six-year statute of limitations had not yet run as against Michael Strand. When [the note holder] sought judgment on the note and foreclosure against Michael Strand in 2009, its foreclosure action was timely because Michael Strand continued making payments until about 2005." (quotation simplified)). Thus, because another obligor continued to make payments, "*DiMeo* sheds little light on the present case, and [Bank's] reliance on *DiMeo* is misplaced." *See id.*

¶51  Having determined (1) that Homeowners' written communications made after the last payment on the Debt fell "short of the legal standard in Utah for an enforceable acknowledgment" of the Debt, *see Wells Fargo Bank, NA v. Temple View Invs.*, 2003 UT App 441, ¶ 11, 82 P.3d 655, (2) that the limitations period was not tolled by the bankruptcy stay or the statutory hold on conducting a trustee's sale, (3) that the doctrine of equitable estoppel did not toll the limitations period, and (4) that Bank's right to foreclose was extinguished, we conclude that the statute of limitations had expired and Bank was accordingly barred from proceeding with the foreclosure.

## II. Quiet Title

¶52  Having discerned no error in the district court's decision that the statute of limitations had expired on Bank's right to foreclose on the Property, we conclude that the court did not err in quieting title in favor of Homeowners. Because Homeowners held title to the Property, Homeowners had a superior claim to

the Property; accordingly, quieting title in favor of Homeowners was appropriate. *See WDIS, LLC v. Hi-Country Estates Homeowners Ass'n*, 2019 UT 45, ¶ 43, 449 P.3d 171 ("[A] a quiet title claim analysis . . . requires the court to determine whether [one claimant's] property interest is superior to the interests of the other named adverse claimants.").[5]

### III. Attorney Fees

¶53 Bank argues that the district court—in addition to being incorrect about the underlying judgment—"erred on a more fundamental level when it held that the [Trust Deed] was not operative as to [Bank's] ability to foreclose, but was operative for the purposes of awarding attorney's fees and costs." In fact, the district court did not rely solely on the Trust Deed but coupled the attorney fees provision of the Trust Deed with Utah's reciprocal fee statute in awarding fees to Homeowners. *See* Utah Code Ann. § 78B-5-826 (LexisNexis 2018) ("A court may award costs and attorney fees to either party that prevails in a civil action based upon any promissory note, written contract, or other writing . . . when the provisions of the promissory note, written contract, or other writing allow at least one party to recover attorney fees."). The court reasoned that had Bank been "successful in seeking to enforce the Trust Deed against [Homeowners'] property, [Bank] would have been entitled to recover [its] reasonable attorneys' fees and costs incurred in the course of that action." Thus the court concluded that "the provisions of the Trust Deed would allow at least one party in this action to recover attorney fees as set forth in Utah Code § 78B-5-826 and the Supreme Court's

---

5. In a cross-appeal, Homeowners ask us to review the district court's denial of their request for reconveyance. As Homeowners point out in briefing, it is unnecessary for us to resolve this issue because our affirmance of the district court's issuance of the quiet title declaration grants "substantially the same relief" Homeowners sought in their motion for reconveyance.

decision in . . . *Bylsma v. R.C. Willey*." *See Bylsma v. R.C. Willey*, 2017 UT 85, ¶ 89, 416 P.3d 595 ("And because [the creditor] would have been entitled to fees if it had prevailed in a collection action, the [debtors] have a statutory right to seek fees under Utah Code section 78B-5-826 because they succeeded on their claim for rescission."). Bank counters by arguing that if the Trust Deed "was an unenforceable instrument as to [Bank], then [Homeowners] could not have relied on it to obtain an award of fees and costs on reciprocal basis."

¶54    But Bank misunderstands the basis of the district court's award of fees. The court awarded fees pursuant to the reciprocal fee statute, not under the provision of the Trust Deed. The attorney fees provision of the Trust Deed merely triggered the application of the reciprocal fee statute. Just as in *Bylsma*, where an entire contract was rescinded and yet the victorious debtors were still entitled to attorney fees under the reciprocal fee statute, so it is here. *See Bylsma*, 2017 UT 85, ¶¶ 89–92. Even though Bank lost the right to foreclose on the Trust Deed after expiration of the limitations period, the district court retained the discretion to award attorney fees to Homeowners. Thus we find no error in the district court's award of attorney fees to Homeowners pursuant to the reciprocal fee statute.

¶55    Finally, Homeowners ask for attorney fees on appeal. "When a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Win-Win Invs. LLC v. Dutson*, 2021 UT App 18, ¶ 27, 483 P.3d 64 (quotation simplified). Because the district court awarded fees below and because Homeowners have prevailed on appeal, we grant their "request for fees and costs on appeal and remand for the district court to calculate the award." *See Thomas v. Thomas*, 2021 UT App 8, ¶ 45, 481 P.3d 504.

## CONCLUSION

¶56 We find no error in the district court's determination that the statute of limitations had run on Bank's right to foreclose against the Property, that the doctrine of equitable estoppel did not toll the limitations period, and that Bank retained no right to foreclose once the limitations period had run as to Homeowners. Further, the court did not err in quieting title in favor of and awarding attorney fees to Homeowners. We therefore affirm the orders of the district court and remand for the district court to calculate the amount of attorney fees and costs Homeowners incurred on appeal.

_____